# United States Court of Appeals
## For the First Circuit

No. 04-1886

ESTATE OF IDA ABRAHAM, Deceased;
DONNA M. CAWLEY and DIANA A. SLATER, Administratrixes,

Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

APPEAL FROM A DECISION
OF THE UNITED STATES TAX COURT

Before

Torruella, Lynch, and Howard, <u>Circuit Judges</u>.

<u>Brendan J. Shea</u> for appellants.
<u>Michael J. Haungs</u>, Tax Division, Department of Justice, with whom <u>Eileen J. O'Connor</u>, Assistant Attorney General, and <u>Jonathan S. Cohen</u>, Tax Division, Department of Justice, were on brief, for appellee.

May 25, 2005

**LYNCH**, <u>Circuit Judge</u>.  This is an appeal from a Tax Court determination unfavorable to the estate of Ida Abraham (the Estate), brought by her two daughters as administratrixes. Applying 26 U.S.C. § 2036(a), the Tax Court concluded that the Estate had underreported the taxes due because the decedent had an interest in certain property purportedly transferred to her children by gift and purchase, that the purchase of the decedent's interests by the children were not bona fide sales for adequate and full consideration, and that the decedent retained rights in the income from the total property.  <u>Estate of Abraham</u> v. <u>Comm'r</u>, 87 T.C.M. (CCH) 975, 979-82 (2004).  As a result, the court rejected the Estate's challenge to the IRS determination of a tax deficiency, which, after a decrease for state tax credits not relevant here, came to $939,195.00.

We affirm the Tax Court.  We consider both the specificity required in a notice of deficiency and the various requirements of 26 U.S.C. § 2036(a).

Ida Abraham suffered from Alzheimer's disease and had to be placed under guardianship.  In 1995, a Massachusetts probate court entered a stipulated decree requiring the establishment of an estate plan for Mrs. Abraham.  That action was taken in order to ensure that Mrs. Abraham's financial needs would be met and to prevent her estate from being drained by the contentious litigation among her children.  Mrs. Abraham died on June 9, 1997.

As part of the estate plan, three pieces of commercial property, which were owned by Mrs. Abraham and which generated steady rental income, were transferred to three family limited partnerships (FLPs). Mrs. Abraham and her children were partners in those FLPs. Between 1995, when the FLPs were set up, and 1997, when Mrs. Abraham died, she, through her guardian ad litem, transferred percentage interests of her share in the partnerships to her children and their families. Upon her death, the Estate included in her estate tax return only the percentage interests in the FLPs still held by her at her death and valued these interests by applying minority and lack of marketability discounts. As explained, the IRS assessed a deficiency based on 26 U.S.C. § 2036, and the Tax Court rejected the Estate's challenge.

**I.**

Establishment of the Estate Plan

Ida Abraham and her husband, Nicholas Abraham, had four children: Nicholas A. Abraham, Richard Abraham, Donna Cawley, and Diana Slater. Nicholas, Sr., died on June 5, 1991, and litigation amongst the children over his estate followed.

Among the assets Mrs. Abraham received from her husband were three pieces of commercial real estate located in Tyngsboro and Walpole, Massachusetts, and in Smithfield, Rhode Island. The Walpole property was leased to a lumber yard, and the other properties were skating rinks leased to third parties. The leases

on all of these properties were long-term, triple net leases to third parties unrelated to the Abraham family.[1]

At some point during this period, Mrs. Abraham developed Alzheimer's disease. A Massachusetts probate court placed her under guardianship on March 10, 1993. The probate court appointed her daughter, Donna, as a permanent guardian of Mrs. Abraham's estate and property. Litigation and discord among the children, mainly between Richard and the two sisters, continued. The feud was apparently over what amount was needed for Mrs. Abraham's protection. The litigation was also draining Mrs. Abraham's assets. In order to end this, on August 1, 1995, Mrs. Abraham's children,[2] their respective counsel, and Mrs. Abraham's legal guardians signed a stipulated court decree to establish an estate plan for Mrs. Abraham pursuant to an agreement. The decree set forth the expectation for the estate plan and for the responsibilities of the parties. There was a separate estate plan. The Tax Court later considered evidence about the decree on the issue of the understanding of the parties.

---

[1]"The triple net lease is a lease in which the tenant is responsible for taxes, insurance, utilities, and maintenance." United States v. Stoddard, 875 F.2d 1233, 1235 (6th Cir. 1989). In essence, the three properties generated a steady stream of rental income with minimal effort by the owners.

[2]The oldest son, Nicholas A. Abraham, was not on the petition. Apparently, he "opted out" of the litigation "early on" and decided to forgo any interest in his mother's estate. In the rest of this discussion, the term "children" is assumed to refer to the three remaining siblings: Richard, Donna, and Diana.

-4-

The decree provided for the placing of the three pieces of income-producing commercial real estate in FLPs and then apportioning out percentage interests in the FLPs to the children in order to reduce the Estate's tax liability upon Mrs. Abraham's death. But the family also understood that the FLPs were a means to protect Mrs. Abraham financially. As Donna testified at trial:

> [T]he partnerships assured . . . that [Mrs. Abraham] would be constantly protected. She would never want for anything. There would always be money there. And if there wasn't money in her partnership fund, it had to come out of my partnership shares or my brother's, but the protection was there for her as a guarantee that she would live status quo.

The decree provided that attorney David Goldman would be named as a limited guardian ad litem with respect to Mrs. Abraham's interests in the FLPs and would:

> have the right to meet with the guardians of the person and the estate of Ida Abraham in order to ascertain her needs to determine any and all shortfall as between the funds generated by Ida Abraham's segregated property and the income required [for] her from each of the separate limited partnerships.

For each FLP, Mrs. Abraham would be made a general and limited partner, while the three children, Richard, Donna, and Diana, would also receive limited partnership interests in their respective FLPs. The decree provided that each child, as a limited partner, would:

> receive income from said family limited partnership . . . either as the management fee and/or gifts from Ida Abraham after deducting

> from the gross income of the partnership all
> fees, taxes, partnership administration
> expenses, <u>reserve for expenses and monies
> needed in the discretion of the limited
> Guardian ad litem for Ida Abraham's support</u>.

(emphasis added).  Under the decree, although the later FLP agreements are silent on the point, support for Mrs. Abraham came from the income of the overall partnerships.  The three partnerships under the decree "share equally . . . the support of Ida Abraham insofar as the funds generated by Ida Abraham's properties maintained by her do not provide sufficient funds for her adequate health, safety, welfare and comfort as determined by the limited Guardian <u>ad litem</u> . . . ."

There were two mechanisms by which the children would increase their ownership share in the FLPs, thus ostensibly reducing Mrs. Abraham's estate: by gift or by purchase.  The decree provided that annual gifts consisting of limited partnership interests in the three FLPs would be made "in amounts not to exceed the then available annual gift tax exclusion for federal gift tax purposes" to the three children and their families.  The three children would also have the right to purchase from Mrs. Abraham additional limited partnership interests in their respective FLPs, with the proceeds from the sales "held in a revocable trust for the benefit of Ida Abraham during her lifetime and . . . utilized for her needs (only if her other assets are insufficient to do so) and

then held for such child and his or her family upon the death of Ida Abraham."

Finally, the decree provided that:

> Ida Abraham's living arrangements shall remain in accordance with the present arrangement and every effort will be made to maintain her in "status quo." Her segregated assets shall be maintained at a level established by the limited Guardian <u>ad litem</u> in his sole discretion.

The decree thus gave the guardian ad litem power not to make gifts from Mrs. Abraham's share if that would contravene maintaining the status quo as to Mrs. Abraham's living conditions.

<u>Creation of the FLPs and the Transfers of the Underlying Real Estate</u>

The estate plan that was established essentially followed the plan agreed to by the parties in the decree, though there were some differences in the details. We omit discussion of details not pertinent to the appeal here.

In October 1995, three separate FLPs, one for each of the three children embroiled in the litigation, were created: (1) The RMA Smithfield/Walpole Family Limited Partnership for Richard (RMA FLP), (2) The DAS Tyngsboro Family Limited Partnership for Diana (DAS FLP), and (3) The DAC Tyngsboro Family Limited Partnership for Donna (DAC FLP). The commercial real estate properties were placed in the FLPs.[3] Instead of having Mrs. Abraham as the general

---

[3]Some of the properties were deeded to real estate trusts with the respective FLPs made 100% beneficiaries. For our purposes,

partner, each FLP had, as its respective general partner, a separate management company formed for this purpose. Each management company, as corporate general partner, had only a 1% interest in the respective FLPs, but each also had "the exclusive right to manage the business of the Partnership," including the authorization "to dispose of all or substantially all of the assets of the Partnership without the consent of the Limited Partners." Attorney Goldman was the sole corporate officer of the general partner management companies for the DAC and DAS FLPs. Because Richard refused to indemnify Goldman, Harold Rubin, Richard's accountant, was put in charge of the general partner management company of the RMA FLP. Rubin was also named Mrs. Abraham's guardian ad litem with respect to Richard's interests in the partnership, but had to defer to Goldman as Mrs. Abraham's guardian ad litem, and Rubin had "no control whatsoever over [Mrs. Abraham]."

The partnership agreements did not specifically mention any obligation for Mrs. Abraham's support as specified in the decree. The agreements provided that if cash were available for distribution to the partners, the cash should first be used to discharge "debts and obligations of the Partnership and management fees," then to "fund reserves for working capital, improvements or

---

these details are not relevant and the parties stipulated that the properties were "placed in" the FLPs.

-8-

replacements or contingencies, to the extent deemed reasonable by the General Partner," and finally "to the Partners in proportion to their respective Percentage Interests."

The October 1995 transfers of the underlying real estate to the FLPs are referred to by the parties as "the first set of transfers." The parties stipulate that at the time of the transfer of the Tyngsboro property to the DAC/DAS FLPs, the property's value was $1,800,000, with the undivided one-half interest in each FLP valued at $900,000. Mrs. Abraham initially held a 98% limited partnership interest in each of the DAC and DAS FLPs. Donna and Diana each held a 1% limited partnership interest in the respective FLPs. It does not appear from the record that Donna or Diana paid for their 1% interests, but in the end that is immaterial.[4]

In order to establish the value of the percentage interests in the partnerships (as of the time the FLPs were set up), the children submitted to the Tax Court the valuation set out in a November 9, 1995 letter from attorney William Kirchick, an estate planning lawyer chosen to draft Mrs. Abraham's estate plan. In that letter, Kirchick explained that each 1% interest in the DAC/DAS FLPs was valued at $9,091, but that he had applied a 15%

_____

[4]According to a letter dated November 9, 1995, from William Kirchick, an estate planning lawyer chosen to create Mrs. Abraham's estate plan, Donna and Diana were deemed to have made a $9,091 capital contribution to the respective FLPs. This amount was apparently computed by treating $900,000, the FLP's interest in the underlying Tygnsboro property, as 99% of the final value of the FLP.

discount for minority interest and a 25% discount for lack of marketability to arrive at the market value of $5,795 for each 1% interest. At trial, attorney Kirchick was not qualified as an expert and did not testify, and there was no explanation in the letter for how he arrived at these discount percentages. At the end of the letter, attorney Kirchick added the following disclaimer:

> You should know that no representation is made that these discounts will hold up or that you will be entitled to the full amount of the annual exclusions claimed for the gifts made. Each partnership and the assets thereof must be judged on their own merits, and it is not possible to ascertain with any degree of certainty what will pass muster with the Internal Revenue Service.

That warning proved to be prophetic.[5]

At trial, the Commissioner objected to the introduction of this valuation letter into evidence. The Tax Court admitted the letter for the limited purpose of showing that the children relied on the given valuation. But the court did not consider it as evidence that the discounts were appropriate.

---

[5]We do not delve into the details about the transfer of the Smith/Walpole properties to the RMA FLP because they are not as relevant to the subject of this appeal due to the fact that Richard did not purchase any FLP interests. In broad terms, the events were similar to the events surrounding the DAC/DAS FLPs.

<u>"Purchase" of Partnership Interests by the Children</u>

The transfers of interests in the FLPs subsequent to their formation are referred to by the parties as "the second set of transfers."

In October of 1995, Diana and Donna each wrote a $160,000 check to Mrs. Abraham, and in exchange, Mrs. Abraham, through her guardian ad litem, transferred a 27.783% limited partnership interest in the DAS FLP to Diana, and a 26.057% limited partnership interest in the DAC FLP to Donna.[6]

Attorney Goldman only created one checking account for each FLP, and in the same general account he deposited the income from the monthly rent generated by the underlying real estate and the money paid to Mrs. Abraham to purchase limited partnership interests. No effort was made to segregate income paid to Mrs. Abraham for the transfer of her shares from the income from her ownership interest. This was not in compliance with the court decree, which specified that the funds paid to Mrs. Abraham to purchase her limited partnership interests would be held in a revocable trust for her benefit.

---

[6]Applying the valuation the parties relied on in Kirchick's letter ($5,795 per 1% interest), it appears that Diana was credited with having paid $161,000 ($5,795 x 27.783 = $161,002.48) while Donna was credited with having paid $151,000 ($5,795 x 26.057 = $151,000.31). Apparently this discrepancy was deliberately introduced in order to ensure that the two families would end up with roughly equal ownership in the FLPs after gift interests were added.

On March 25, 1996, Donna wrote out a $30,000 check made payable to the DAC FLP, but not to Mrs. Abraham, drawn on an account in both Donna and Diana's names. In exchange, Donna received a 5.178% limited partnership interest in the DAC FLP from Goldman (who held the shares for Mrs. Abraham). On the same day, Donna also wrote out a $40,000 check made payable to the DAS FLP drawn on the same checking account that she and Diana shared. In exchange, Diana received a 6.904% limited partnership interest in the DAS FLP from Goldman.

In March 1997, Donna and Diana each purchased an additional 8.63% interest in their respective FLPs by paying $50,000 to the FLPs.

Gifts to the Children

Also, between 1995 and 1997, Goldman, as Mrs. Abraham's guardian ad litem, made total gifts of 22.438% interests in the DAS FLP to Diana and her family. During the same time, Goldman made total gifts of 25.89% interests in the DAC FLP to Donna and her family.[7] Between 1995 and 1997, Goldman made gifts from Mrs. Abraham's share of 23.439% interests in the RMA FLP to Richard and his family.[8]

_____

[7]These percentages were computed (based on the discounted value for each 1% interest set out in Kirchick's letter) to come within the annual federal gift tax exclusion. See 26 U.S.C. 2503(b).

[8]Mrs. Abraham initially held a 99% limited partnership interest in the RMA FLP. On December 26, 1995, through her

-12-

Operation of the FLPs

Each month between the creation of the FLPs and Mrs. Abraham's death, Donna, as guardian of Mrs. Abraham's person, would send letters to Goldman setting out the monthly "shortfall" in payment for Mrs. Abraham's expenses and demanding that the three FLPs make up the shortfalls. The shortfall represents the extent to which Mrs. Abraham's personal income from sources such as Social Security and an annuity could not cover her expenses. Goldman occasionally sought documentation of certain expenses, but ultimately always found Donna's accounting in order. Goldman would then divide the shortfall amount in three, and cause checks to be written to Donna from the accounts of the three FLPs to pay the shortfall.

Each month, Goldman also paid out to Donna, Diana, and Richard their percentage ownership share (which also included the shares gifted to their families) of the income from the FLPs. According to some early accounting records of the FLPs, the net income of the partnerships was computed by deducting from the gross income of the partnerships expenses such as administration fees and insurance. At least in these early accounting records, the payments from the partnerships to make up the shortfall in Mrs.

_____

guardian ad litem, Mrs. Abraham transferred a 30% limited partnership interest in the RMA FLP to Richard in exchange for his settling of the claims against her estate. This 30% interest in the RMA FLP is not at issue in this appeal. See infra note 10.

-13-

Abraham's expenses were not treated formally on the books as partnership expenses. There were no FLP accounting records from later in the record.

Donna testified at trial that it was her understanding that all of the partnership income from the FLPs would be available to pay Mrs. Abraham's expenses regardless of the children's ownership interests, and that Goldman was obliged to use the overall partnership funds to make up the shortfall. Goldman testified at trial that he acted as a fiduciary for Mrs. Abraham, and understood his "first responsibility, as set out in the documents, and as [he] discussed with everyone, [to be] to . . . use funds necessary to maintain [Mrs. Abraham] as is." Goldman testified that he saw his duties and authority as guardian ad litem to originate in the court decree, and specifically in the sections of the decree which provided that partnership funds had to be reserved for Mrs. Abraham's needs and that Mrs. Abraham's living arrangements were to be maintained in "status quo." Although he acknowledged that he had various other fiduciary duties in so far as he also managed the general partner management companies for the FLPs, his view was that "the reason [he] was appointed was to work on [Mrs. Abraham's] behalf, period."

Goldman also testified that he never paid either Donna or Diana more than their share of the partnership funds, and that during the whole time he acted as her guardian ad litem, he paid

-14-

Mrs. Abraham's monthly shortfalls out of the share of FLP income attributable to Mrs. Abraham. He admitted, though, that if Mrs. Abraham's needs had increased beyond the income generated by the share attributable to her, he would have put Mrs. Abraham "in the top priority" and used "any money that was at [his] disposal to use to account for her." He also explained that if one of the FLPs lost its source of income, he would have used his discretionary power to make up the shortfall from funds in the other FLPs. Although he did testify at one point that he did not think he could outright refuse to pay to Diana and Donna the income attributable to the FLP interests they had purchased, he immediately amended his testimony to explain that it was his and the family's understanding that all FLP funds could be used to fulfill Mrs. Abraham's needs and had he used the funds in this way, he "would have been doing . . . what the family would have wanted."

Events Following Mrs. Abraham's Death

On June 9, 1997, Mrs. Abraham died. Based on the calculations in a letter from Michael Lipof, a real estate consultant, the Estate reported in its Estate (and Generation-Skipping Transfer) Tax Return that the fair market value of Mrs. Abraham's 45% interest in the RMA FLP was $242,750 and the value of her 33.3% interest in the DAC/DAS FLPs was a combined $476,666.[9]

---

[9]Lipof valued the Smith and Walpole properties together at $830,000 and the Tyngsboro property at $2,200,000 at the time of Mrs. Abraham's death. Treating the value of the underlying

-15-

During the three months after Mrs. Abraham's death, attorney Goldman disbursed $120,869.42 to Diana from the DAS FLP and $93,078.62 to Donna from the DAC FLP. These amounts were not reported on the Estate's tax return. The Commissioner does not seek to include these amounts in the gross estate.

## II.

The Internal Revenue Service audited the Estate's tax return and determined a deficiency of $1,125,210 plus interest. The Notice of Deficiency was issued on February 28, 2001. In the Notice, for each FLP, the value of each FLP as reported by the Estate was set aside, and the underlying value of the commercial real estate held by the FLP was included as part of the gross estate.[10] The Notice gave the following explanation for each FLP:

> It is determined that the decedent/guardian transferred [name of FLP] for less than adequate and full consideration in money or money's worth and that the decedent, through the guardian, retained an interest in the asset. Therefore, pursuant to I.R.C., section

property as the value of the FLP holding the property, Lipof then computed the market value of Mrs. Abraham's percentage interests in the respective FLPs. Lipof applied a 30-40% discount to the value of the partnership interests for lack of marketability.

[10]The Notice of Deficiency only sought to include 70% of the value of the assets of the RMA FLP in the gross estate, crediting the Estate for Richard's settlement of his claims against the Estate for a 30% stake in the FLP. Although the Commissioner's position is that this determination was erroneous and 100% of the value of the assets in the RMA FLP should have been included, the Commissioner did not seek to increase the deficiency amount in the Tax Court and does not do so before this court. See Estate of Abraham v. Comm'r, 87 T.C.M. (CCH) 975, 982 n.29 (2004).

-16-

2036, the fair market value of the asset is includable in the decedent's gross estate. Accordingly, the taxable estate is increased by [fair market value of the underlying real estate].

The provision of the code pursuant to which the Commissioner determined a deficiency provided, in relevant part:

**(a) General rule.**--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

**(1)** the possession or enjoyment of, or the right to the income from, the property, or

**(2)** the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

26 U.S.C. § 2036(a).

The Estate petitioned the Tax Court for a redetermination of the deficiency. Trial in the Tax Court was held on October 16, 2002. The Tax Court issued a memorandum decision on February 18, 2004. See Estate of Abraham v. Comm'r, 87 T.C.M. (CCH) 975 (2004).

The Tax Court first determined that the burden of proof was on the Estate, rejecting the Estate's argument that the Notice of Deficiency failed to give adequate description of the factual and legal bases for the deficiency determination. Id. at 979.

-17-

The Tax Court found that it was the understanding of the children and the legal representatives that Mrs. Abraham "was entitled to any and all funds generated from the partnerships for her support first. Only after this could any excess be distributed in proportion of the partners['] supposed ownership interests. Here, it is clear that at the time of the transfers, decedent explicitly retained the right to the income that the FLPs generated to the extent necessary to meet her needs." Id. at 981 (emphasis in original).

The Tax Court further found that the initial sales by Mrs. Abraham of FLP interests to Donna and Diana for $160,000 each did not constitute "bona fide sale[s] for adequate consideration" within the meaning of 26 U.S.C. § 2036(a) because the Estate did not produce sufficient evidence to demonstrate the fair market value for the partnership interests on the dates of the transfers. Id. at 982. In addition, in the case of the subsequent purchases, the money was paid to the FLPs, not to Mrs. Abraham, and thus, the court found, could not qualify as bona fide sales. Id. Accordingly, the Tax Court upheld the deficiency determination. The final determination of the deficiency, after credits for state estate, inheritance, legacy or succession taxes, was $939,195.00.

The Estate timely appealed to this court.

-18-

**III.**

The Burden of Proof

The Estate first argues that the Tax Court erred by placing the burden of proof on the Estate instead of on the Commissioner. We review the allocation of the burden of proof, a question of law, de novo. See Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 93 (1st Cir. 1999).

Generally, the taxpayer bears the burden to refute by a preponderance of the evidence the Commissioner's determination of deficiency, which is presumed to be correct. See Welch v. Helvering, 290 U.S. 111, 115 (1933); Delaney v. Comm'r, 99 F.3d 20, 23 (1st Cir. 1996); T.C.R. 142(a)(1). But where the Notice of Deficiency fails to adequately "describe the basis on which the Commissioner relies to support a deficiency determination" and the Commissioner seeks to establish the deficiency on a basis not described in the Notice, the burden shifts to the Commissioner on that new basis. Shea v. Comm'r of Internal Revenue, 112 T.C. 183, 197 (1999); see T.C.R. 142(a)(1). "A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence." Wayne Bolt & Nut Co. v. Comm'r, 93 T.C. 500, 507 (1989). But if the theory "merely clarifies or develops the original determination[, it] is not a new matter in respect of which [the Commissioner] bears the burden of proof." Id.

-19-

The Estate's main argument is that the Notice was "latently ambiguous, overly broad and confusing" and failed to specify all the elements of the Commissioner's argument that under § 2036, the FLP interests were 100% taxable to the estate. The Estate argues that the Notice should have described "why the consideration was inadequate" and "the amount of consideration the Government would consider adequate," as well as "which of the alternative possession, enjoyment or right to income theories it is relying on alleging a taxable event has occurred pursuant to § 2036(a)." The Estate also argues that the Notice failed to explain how the Commissioner valued the FLP interests at the fair market values of the underlying real estate. Therefore, the Estate argues, the burden of proof on all of these "new matters" should have been placed on the Commissioner.[11]

Acceptance of the Estate's arguments would amount to a requirement that the Notice of Deficiency be as detailed as trial briefs. There is no such requirement. The standard of specificity for notices of deficiency is much lower. "In fact, if a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter, and the burden of proof remains with the taxpayer." Abatti v. Comm'r, 644 F.2d 1385, 1390 (9th Cir. 1981);

---

[11]The Estate makes no argument that burden shifting is appropriate under 26 U.S.C. § 7491.

see also Shea, 112 T.C. at 191. The Commissioner did not seek to change the amount of the deficiency or advance a theory inconsistent with the language of the Notice.

The Estate relies for its burden shifting argument on cases with very different facts and which are easily distinguishable. See, e.g., Estate of Thompson v. Comm'r, 84 T.C.M. (CCH) 374, 385 (2002) (Commissioner had the burden on the applicability of § 2036 because the notice of deficiency discussed disallowance of minority and lack of marketability discounts but did not mention § 2036.); Shea, 112 T.C. at 192 (Commissioner had the burden on the applicability of 26 U.S.C. § 66(b) and California community property law because neither was explicitly or implicitly referenced in the notice of deficiency.). Here, the Notice specifically named § 2036 as the legal basis for the deficiency and explained the factual basis for the determination as being Mrs. Abraham's retention of an interest in all the income from the FLPs through her guardian despite transfers of FLP interests to her children without adequate consideration.

As to the valuation question, while the Notice itself does not explain, step-by-step, why the Commissioner wanted to include in the gross estate the total value of the underlying real estate, it is clear that the Estate was never confused about the Commissioner's theory. The Estate's tax return included attachments in which the Estate computed the value of the FLP

-21-

interests nominally held by Mrs. Abraham at the time of her death. The Estate's own computations began with, and then applied discounts to, the fair market value of the underlying real estate. This was logical since the only property held by the FLPs was the real estate and rental income generated by the real estate. The Notice of Deficiency cited § 2036 and included in Mrs. Abraham's gross estate the fair market value of the underlying real estate <u>as reported by the Estate</u>.

Read in context, the clear implication of the Notice of Deficiency was that 1) the Commissioner sought to include 100% of the FLPs in the gross estate, and 2) the Commissioner valued the FLPs at the value of the underlying real estate, as the Estate itself did in its computations. That the Estate shared this understanding of the Commissioner's theory is shown by the Estate's petition to the Tax Court for a redetermination, in which it argued that the Commissioner was wrong to have determined that the entire value of each FLP was includable in the gross estate and also wrong to have valued the FLPs at the value of the underlying real estate. <u>Cf.</u> <u>Olsen</u> v. <u>Helvering</u>, 88 F.2d 650, 651 (2d Cir. 1937) (looking at whether taxpayers were misled to determine adequacy of notice of deficiency).

The Commissioner's valuation is in fact based on the Estate's own appraisal. In such circumstances, "[t]he valuation in the notice of deficiency is entitled to a presumption of

-22-

correctness." Estate of Magnin v. Comm'r, 184 F.3d 1074, 1081 (9th Cir. 1999). To the extent that any discounts may be appropriate due to the fact that the assets are in the form of FLPs, the burden was on the Estate to show the appropriateness of such discounts. That burden was critical to the question of whether the transfers of FLP interests were for adequate consideration in money or money's worth, an aspect of the § 2036 analysis also set out in the Notice of Deficiency. The Notice of Deficiency was adequate to provide notice to the Estate, and the Commissioner did not argue any "new matter" over which burden shifting to the Commissioner would have been appropriate.[12]

**IV.**

Application of Section 2036 to the FLP Interests Transferred By Mrs. Abraham During Her Lifetime

On the merits, the Estate argues that the Tax Court erred in determining that under § 2036, 100% of the FLPs were includable in Mrs. Abraham's gross estate. The Estate argues that the Tax Court erred because 1) Donna and Diana's purchases of percentage interests in the FLPs were bona fide sales for adequate consideration, and 2) Mrs. Abraham did not retain a "right" to, or

_____

[12]The Tax Court decision focused on the applicability of § 2036 to the transfers of FLP interests to Mrs. Abraham's children. On appeal, the Commissioner contends that we should focus our analysis on the applicability of § 2036 to the initial transfers of the real estate to the FLPs and affirm the Tax Court on this different basis. We decline the Commissioner's invitation.

-23-

"enjoy," the income from the percentage interests transferred as the result of an agreement between the parties.

We begin with the structure of § 2036.  Section 2036 is designed to capture in the decedent's gross estate "transfers that are essentially testamentary -- i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime."  United States v. Estate of Grace, 395 U.S. 316, 320 (1969).  A transfer would be covered by § 2036 if the transferor "retained for his life . . . the possession or enjoyment of, or the right to the income from, the property."  26 U.S.C. § 2036.  But if such a transfer were "a bona fide sale for an adequate and full consideration in money or money's worth," § 2036 would not apply.[13]  Id.

Bona Fide Sale

The Estate argues that except for the outright gifts of FLP interests, Donna and Diana paid adequate and full consideration and purchased their other percentage interests in the FLPs in bona fide sales so that it was error to include those non-gifted interests in Mrs. Abraham's gross estate.

_____

[13]The Estate and the Commissioner disagree over whether we should analyze the "retained interest" branch or the "bona fide sale" branch first.  It makes no difference in which order the analysis is done.  The two branches are not completely overlapping. The gratuitous gifts of FLP percentage interests were not "sales," bona fide or other wise, and would only escape inclusion under § 2036 if Mrs. Abraham retained no interest in those transferred FLP interests.

-24-

The biggest hurdle in the way of the Estate (and the reason why it lost in the Tax Court) is that it did not meet its burden to prove that Donna and Diana paid adequate consideration for their FLP interests. The Estate produced no admissible evidence concerning the adequacy of the discounted value of the FLP percentage interests because the valuation letters from Kirchick, on which the Estate relies, were excluded from evidence for those purposes.[14] The Estate does not challenge that evidentiary ruling by the Tax Court here.

Attempting an end run, the Estate now argues that the Tax Court erred as a matter of law because the Tax Court used the wrong test for what constituted adequate consideration. The Estate argues that whether full and adequate consideration was paid should be measured by the value of the remainder interest of the FLP percentages at the time of the transfers and not the fee simple value of the FLP percentages at the time of the transfers. The Estate argues that Donna paid $251,000 for 43.317% of the DAC FLP, while the remainder value of that portion of the DAC FLP, computed according to the actuarial tables in IRS regulations, was only $227,410. Similarly, the Estate argues, Diana also overpaid for

---

[14]In addition to the fact that the letters were inadmissible hearsay, they contained inadequate explanation for the valuation computation. There was no explanation for why Donna and Diana were deemed to have made 1% capital contributions; there was no explanation for how the minority and lack of marketability discounts were computed; and the letters contained extensive disclaimers as to the reliability of the valuation.

her interests in the DAS FLP, as measured by the actuarial value of the remainder interest. The Commissioner, unsurprisingly, disputes the accuracy of these computations.

But this dispute is beside the point. The Estate relies on a series of cases in which the decedent sold the remainder interest in property for its actuarial value while retaining a life estate in the property, and the courts held in those cases that "adequate and full consideration" for § 2036 purposes should be measured by what the decedents actually sold -- the remainder interests -- and not the fee value of the property as a whole. See, e.g., Estate of Magnin, 184 F.3d at 1078; Wheeler v. United States, 116 F.3d 749, 767 (5th Cir. 1997); Estate of D'Ambrosio v. Comm'r, 101 F.3d 309, 311, 317-18 (3d Cir. 1996). But those cases are inapplicable to the facts here, where no evidence in the record suggests that the parties ever contemplated the transfers as sales by Mrs. Abraham of remainder interests in the FLPs.

In fact, the evidence in the record is all to the contrary. The Estate's argument here is directly in conflict with its position at trial, where it vigorously attempted to show that Donna and Diana purchased present fee interests in the FLPs. The documents memorializing the transfers of FLP interests from Mrs. Abraham to her daughters do not speak of remainder interests, and the parties computed the amount of money paid by Donna and Diana for the FLP interests in reliance on (unsubstantiated) minority and

lack of marketability discounts, not on the actuarial value of the remainder interests in the FLPs. The Estate in its appellate brief argues that "[t]he transferee will not possess or enjoy the property until the death of the transferor," which is plainly untenable in view of the fact that Donna and Diana received monthly payments from the FLPs during Mrs. Abraham's lifetime.

The interests that were transferred are best described as present interests in the FLPs subject to Mrs. Abraham's interest in diverting all FLP income for her needs, a power to be determined and exercised at the discretion of her guardian ad litem. When all the evidence in the record suggests that the transfers were not treated by anybody as sales of remainder interests in the FLPs, it is impossible for the transfers to qualify as "bona fide sales [of remainder interests] for adequate and full consideration."

It should be noted that the Commissioner did give the Estate credit for the $160,000 payments under 26 U.S.C. § 2043, offsetting these payments from the full value of the underlying asset. See Estate of Abraham, 87 T.C.M. (CCH) at 982.

Right and Enjoyment

The Estate next argues that the Tax Court erred in holding that Mrs. Abraham "retained the right to the income that the FLPs generated to the extent necessary to meet her needs." Estate of Abraham, 87 T.C.M. (CCH) at 981. The Estate makes two intertwined arguments: 1) Mrs. Abraham did not retain a legally

-27-

enforceable "right" within the meaning of § 2036, and 2) there was no agreement that Mrs. Abraham would retain a first-access interest in all the income from the FLPs to the extent necessary for her support.

In order for § 2036 to apply, it is not necessary that the decedent-transferor retain <u>a legally enforceable interest</u> in the property. <u>See</u> <u>Estate of Maxwell</u> v. <u>Comm'r</u>, 3 F.3d 591, 593-94 (2d Cir. 1993); <u>Guynn</u> v. <u>United States</u>, 437 F.2d 1148, 1150 (4th Cir. 1971). "An interest retained pursuant to an understanding or arrangement comes within § 2036." <u>Guynn</u>, 437 F.2d at 1150. "The existence or nonexistence of such an understanding is determined from all of the facts and circumstances surrounding both the transfer itself and the subsequent use of the property." <u>Estate of Harper</u> v. <u>Comm'r</u>, 83 T.C.M. (CCH) 1641, 1648 (2002). The finding by the Tax Court that such an understanding existed is reviewed for clear error. <u>See</u> <u>Estate of Maxwell</u>, 3 F.3d at 594. As with other issues, the Estate "bears the burden (which is especially onerous for transactions involving family members) of proving that an implied agreement or understanding between [Mrs. Abraham] and [her] children did not exist." <u>Estate of Reichardt</u> v. <u>Comm'r</u>, 114 T.C. 144, 151-52 (2000).

We may dispose of the first part of the Estate's argument quickly. The Tax Court did not find that Mrs. Abraham retained a legally enforceable "right" to all the income from the FLPs.

-28-

Therefore the arguments that the Tax Court decision is in conflict with vested property interests of the children is irrelevant.

What the Tax Court did find was that "[t]he documentary evidence, including the stipulated decree of the probate court, and the understanding of decedent's children and legal representatives demonstrate that decedent was entitled to any and all funds generated from the partnership for her support first." Estate of Abraham, 87 T.C.M. (CCH) at 981 (emphasis in original). This finding is not clearly erroneous.

Evidence adduced at trial shows that the motivation for the formation of the FLPs was to protect Mrs. Abraham's financial needs so as to maintain her in status quo and to prevent her estate from being drained by litigation. The FLPs were formed, according to Donna, so that "[t]here would always be money there" for Mrs. Abraham. The probate court decree memorializing the understanding of the parties at the time of the creation of the FLPs explicitly made "monies needed in the discretion of the limited Guardian ad litem . . . for Ida Abraham's support" into an obligation of the FLPs which must be met before any partnership income could be disbursed to the partners.

The Estate chooses to focus on the FLP agreements, which do not include Mrs. Abraham's support as obligations of the FLPs, and argues that the discretion of Goldman, Mrs. Abraham's guardian ad litem and the person in control of the general partner

-29-

management companies for the FLPs, is limited by his fiduciary duties to the other limited partners. But these arguments, at most, show that Mrs. Abraham's first-priority claim on all the income from the FLPs may not be legally enforceable. They do not show that there was no such understanding among the parties.

In fact, the weight of the evidence was just the opposite. The evidence showed that all parties understood that Goldman, as Mrs. Abraham's guardian ad litem, had the discretion and the approval of the family to use all FLP income, if necessary, for Mrs. Abraham's support. Donna testified that if Mrs. Abraham's needs exceeded her share of the partnership income, "it had to come out of my partnership shares or my brother's, but the protection was there for her as a guarantee that she would live status quo." Goldman testified that he had exclusive control over the FLP accounts; he understood his authority and duties to come primarily from the court decree and also understood that he was appointed primarily to work on Mrs. Abraham's behalf. The evidence is that Goldman failed to segregate what was supposed to be Mrs. Abraham's personal funds from the funds in her revocable trust and commingled all monies in the bank accounts for the FLPs. Such commingling in disregard of the partnership form is indicative of Mrs. Abraham's retained interest over all the FLP income. See Estate of Harper, 83 T.C.M. (CCH) at 1649. Goldman also testified that it was his and the family's understanding that should it be necessary, all FLP

-30-

income could be used to pay Mrs. Abraham's expenses, to the exclusion of paying out the shares to any of the other limited partners because that would be "what the family would have wanted."[15]

Neither is it dispositive that, according to the Estate, the FLPs' payments for Mrs. Abraham's maintenance never exceeded what Mrs. Abraham was legally entitled to by virtue of her ownership of FLP percentage interests. That Mrs. Abraham's guardian ad litem did not have the occasion to, or did not choose to, exercise what was conceded to be an available option -- the diversion of all FLP income for Mrs. Abraham's maintenance -- cannot be taken to make the Tax Court's finding that this option existed clearly erroneous.

---

[15]To be sure, there was also some contradictory evidence. For example, at one point Goldman explained that he did not think he could deny the other limited partners (Donna and Diana's families) their monthly income from the FLPs (although he then amended his testimony). It also appears from a few accounting statements done by Donna early on that the expenses for Mrs. Abraham's support were not formally treated as an obligation of the FLPs (but these statements were subsequently corrected for overpayments to Donna and Diana, and there are no detailed accounting statements for the partnerships in the record after the first few months). In any case the decree only called for sufficient funds for Mrs. Abraham's support to be reserved in the FLPs, which does not require the guardian ad litem to treat Mrs. Abraham's support as a partnership expense. The Tax Court, as fact finder, resolved these potential contradictions in favor of the overwhelming evidence that there was such an understanding among the parties, and that finding is not clearly erroneous.

**V.**

The Estate makes a final argument that the Tax Court erred by including 100% of the FLPs in Mrs. Abraham's gross estate under § 2036 because § 2036 only covered the FLP interests that Mrs. Abraham transferred to her children, but not the interests she held at her death. Interests retained by the decedent at her death are of course includable in the gross estate under 26 U.S.C. § 2033,[16] the basic estate tax provision, but the Estate argues that the Tax Court did not address the applicability of § 2033 and thus should be reversed at least with respect to those interests. Further, the Estate maintains that the Notice of Deficiency was confusing because it was not clear whether the deficiency was assessed under § 2036 or § 2033.

This argument is frivolous. The Commissioner invoked § 2036 in order to recapture in the gross estate the FLP interests Mrs. Abraham had allegedly "transferred." Section 2033 was never an issue at trial nor was it mentioned in the Notice of Deficiency because the Estate never disputed that the FLP interests explicitly held by Mrs. Abraham at her death were includable in her gross estate. Throughout the litigation, it was assumed by all parties that the dispute was only over the interests Mrs. Abraham transferred to her children during her lifetime. In fact, the

---

[16]"The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." 26 U.S.C. § 2033.

interests held by Mrs. Abraham at the time of her death were reported in the Estate's initial tax return.

## VI.

The Tax Court's decision is **<u>affirmed</u>**.