# United States Court of Appeals
## For the First Circuit

Nos. 15-1368
     15-1376

WILLIAM CAVALLARO AND PATRICIA CAVALLARO,
Donors,

Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

———————

APPEALS FROM THE UNITED STATES TAX COURT

[Hon. David Gustafson, U.S. Tax Court Judge]

———————

Before

Howard, Chief Judge,
Lynch and Kayatta, Circuit Judges.

———————

Andrew H. Good, with whom Philip G. Cormier, Good Schneider Cormier, Edward DeFranceschi, DeFranceschi & Klemm, P.C., Jack W. Pirozzolo, Joseph R. Guerra, Matthew Lerner, and Sidley Austin LLP were on brief, for appellants.

Caroline D. Ciraolo, Acting Assistant Attorney General, with whom Bruce R. Ellisen, Attorney, Tax Division, U.S. Department of Justice, and Ivan C. Dale, Attorney, Tax Division, U.S. Department of Justice, were on brief, for appellee.

———————

November 18, 2016

———————

**HOWARD**, **Chief Judge**. William Cavallaro and his wife Patricia Cavallaro (together, "the Cavallaros") appeal from a Tax Court decision affirming a determination by the Internal Revenue Service ("IRS") Commissioner that they owed gift taxes on a $29,670,000 gift to their sons. After careful consideration, we affirm in part, reverse in part, and remand to the Tax Court for further proceedings consistent with this opinion.

## I. BACKGROUND

In 1979, the Cavallaros started Knight Tool Co. ("Knight"), a contract manufacturing company that made custom tools and machine parts. William Cavallaro -- whose principal work was making and selling the business's products -- owned 49% of Knight's stock, while Patricia Cavallaro -- who acted as an administrator and bookkeeper -- owned 51%. The Cavallaros' three sons Ken, Paul, and James eventually joined the family business.

In 1982, Knight deviated from its traditional business and developed a liquid-dispensing system for adhesives called "CAM/ALOT." Although Knight invested substantial resources in CAM/ALOT's development, the product had significant flaws, and profits failed to outpace production costs. As a result, the Cavallaros decided to refocus on their core business.

Ken, however, continued to believe in the CAM/ALOT technology and asked his parents if he and his brothers could

organize a new corporation, Camelot Systems, Inc. ("Camelot"), to further develop it. The Cavallaros assented. After Camelot's incorporation, Ken worked with William Cavallaro and other Knight personnel to change CAM/ALOT's design in order to meet customers' needs. Knight manufactured the CAM/ALOT systems, while Camelot sold and distributed them to third parties.

Everyone who worked on CAM/ALOT systems after Camelot's incorporation, including Ken, remained on the Knight payroll and received all their wages from Knight. Knight's and Camelot's financial affairs overlapped in other ways as well. For instance, Camelot did not have its own bank accounts; with minor exceptions, Camelot's bills were paid using Knight's funds. And, as a result of how Knight billed Camelot, Knight effectively immunized Camelot from risk of non-payment for CAM/ALOT systems.

In 1994, the Cavallaros hired both accountants and lawyers to review their estate plan. There was significant friction between these two groups of advisers. Essentially, the lawyers wanted the Cavallaros to claim that the value of the CAM/ALOT technology inhered in Camelot -- and so was already owned by Ken, Paul, and James -- whereas the accountants objected to this proposal because it was at odds with the overwhelming evidence that Knight owned the technology and always had. Attorney Louis Hamel argued in a letter to accountant Kevin McGillivray: "History does not formulate itself, the historian has to give it form

- 3 -

without being discouraged by having to squeeze a few embarrassing facts into the suitcase by force."[1]  As a result of Hamel's persuasive efforts, the lawyers' view prevailed.  Both the lawyers and accountants came to endorse Hamel's suggestion that a 1987 transfer of the CAM/ALOT technology be memorialized in affidavits and a confirmatory bill of sale.  Members of the Cavallaro family signed these documents in May 1995.[2]

Knight and Camelot subsequently prepared to merge.  As part of their preparations, the Cavallaros hired accountant Timothy Maio to determine the respective values of the two companies.  Using a market-based approach, Maio valued the proposed combined entity at $70-$75 million and valued Knight's portion at just $13-$15 million (or 19%).  Notably, Maio assumed that Camelot owned the CAM/ALOT technology and that Knight was a contractor for Camelot.

On December 31, 1995, Knight and Camelot merged in a tax-free merger that left Camelot as the surviving corporation.  William Cavallaro received 18 shares of stock in the merged company; Patricia Cavallaro received 20 shares; Ken, Paul, and

---

[1] This letter was cc'd to the Cavallaros and their three sons, as well as to other advisers.

[2] The affidavits executed by William and Ken averred that Knight transferred "the original dispensing product" to Camelot when the latter was formed in 1987, that Knight received no compensation for this gift transfer, and that the gift had "no ascertainable value."

James received 54 shares each.  The relative value of each company, as determined by Maio, informed the distribution of shares.  Seven months later, Cookson America, Inc. purchased Camelot for $57 million in cash.  On the basis of stock ownership, the Cavallaros received a total of $10,830,000, and each son received $15,390,000.

In 1998, the IRS opened an examination of Knight's and Camelot's 1994 and 1995 income tax returns.  During the income tax examination, the IRS identified a possible gift tax issue in connection with the 1995 merger and opened a gift tax examination as well.  That examination resulted in litigation before this court.  See Cavallaro v. United States (Cavallaro I), 284 F.3d 236 (1st Cir. 2002) (affirming denial of taxpayers' motion to quash a third-party recordkeeper summons).

Ultimately, the IRS issued notices of deficiency to the Cavallaros for tax year 1995.  The IRS determined -- without first having obtained an appraisal -- that Camelot had a pre-merger value of $0.  Thus, when Knight merged with Camelot, William and Patricia Cavallaro each made a taxable gift of $23,085,000 to their sons.[3] As a result, each of the Cavallaros incurred an increase in tax liability in the amount of $12,696,750.  The notices of deficiency also imposed additions to tax for failure to file and fraud,

---

[3] The Commissioner initially determined equal $23,085,000 gift amounts for both William and Patricia Cavallaro but later revised the amounts to reflect the actual division of ownership in Knight.

pursuant to Internal Revenue Code §§ 6651(a)(1) and 6663(a), respectively.

## II. THE TAX COURT PROCEEDINGS

The Cavallaros filed a petition for review with the Tax Court. During discovery, the Commissioner disclosed that -- after the notices of deficiency were issued -- he directed accountant Marc Bello to appraise the value of both Knight and Camelot at the time of the merger. Working under the assumption that Knight rather than Camelot owned the CAM/ALOT technology, Bello valued the combined entities at approximately $64.5 million. Bello concluded that Camelot was worth $22.6 million. The deficiencies would, therefore, be lower than those set forth in the original notices, which assumed that Camelot had no value.

The Cavallaros interpreted the Bello report to mean that the Commissioner had changed his theory of liability. More specifically, they surmised that the Commissioner was no longer pursuing his original theory -- that Camelot was a shell corporation formed to disguise a gift transfer from the Cavallaros to their sons -- in favor of a new theory that Knight was merely undervalued. Prior to trial, the Cavallaros used the Bello report as the basis for their argument that the original notices of deficiency were arbitrary and excessive, or, in the alternative, that the Commissioner's new theory of liability was a "new matter"

- 6 -

within the meaning of Tax Court Rule 142. They moved unsuccessfully to shift the burden of proof to the Commissioner.

During the eight-day bench trial, the Commissioner introduced the Bello valuation into evidence to support his revised deficiency. The Cavallaros introduced both the 1995 Maio valuation and a valuation by John Murphy of Atlantic Management Company, which was consistent with the Maio valuation. Like Maio, Murphy assumed that Camelot owned the CAM/ALOT technology. Ownership of the CAM/ALOT-related technology was a central focus of the trial. The Tax Court ultimately concluded that Knight owned all of it.

The Tax Court denied the Cavallaros' renewed motion to shift the burden of proof to the Commissioner. While noting that it was "evidently true that the Commissioner did not obtain an appraisal before issuing the notices" of deficiency, the Tax Court found that there was a sufficient basis for issuing the notices and, thus, that they were not arbitrary. Further, the court found unpersuasive the Cavallaros' argument that the Commissioner's litigating position was a "new matter" and stated that the Commissioner's "partial concessions as to Camelot's non-zero value" did not require a new theory or change the issues for trial.

The Tax Court ultimately concluded that the Cavallaros were deficient in paying the gift tax due for calendar year 1995: William Cavallaro owed $7,652,980 and Patricia Cavallaro owed $8,009,020. The court also determined -- favorably to the

Cavallaros -- that no penalties for underpayment were due under I.R.C. § 6662(a), § 6662(h), or § 6663(a), and there were no additions to tax due under I.R.C. § 6651(a)(1) for failure to file a gift tax return.

This appeal timely followed.

### III. STANDARD OF REVIEW

"We review decisions of the [T]ax [C]ourt 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'" Interex, Inc. v. Comm'r, 321 F.3d 55, 58 (1st Cir. 2003) (quoting 26 U.S.C. § 7482(a)(1)). Thus, we review the Tax Court's legal conclusions de novo and its factual findings for clear error. Id. We have the authority "to affirm or, if the decision of the Tax Court is not in accordance with law, to modify or to reverse the decision of the Tax Court, with or without remanding the case for a rehearing, as justice may require." I.R.C. § 7482(c)(1).

### IV. CLAIMS ON APPEAL

On appeal, the Cavallaros renew their claim that the Tax Court erred by failing to shift the burden of proof to the Commissioner for two independent reasons: because (1) the original notices of deficiency were arbitrary and excessive, and (2) the Commissioner relied on a new theory of liability. They make two

- 8 -

additional arguments. First, they claim that the Tax Court improperly concluded that Knight owned all of the CAM/ALOT-related technology. Second, they contend that the Tax Court erred by misstating their burden of proof and subsequently failing to consider alleged flaws in Bello's valuation of the two companies.

We consider these claims in turn.

## A. Burden Shifting

A rebuttable presumption of correctness cloaks an IRS notice of deficiency.[4] See, e.g., Bull v. United States, 295 U.S. 247, 259-60 (1935); Delaney v. Comm'r, 99 F.3d 20, 23 (1st Cir. 1996); Tax Ct. R. 142(a); see also United States v. Rexach, 482 F.2d 10, 16 (1st Cir. 1973) (explaining rationales for this presumption). Thus, the taxpayer typically bears the burden of proving by a preponderance of the evidence that the Commissioner's tax assessment is erroneous. Helvering v. Taylor, 293 U.S. 507, 511 (1935); Delaney, 99 F.3d at 23. In some limited circumstances, however, the Commissioner bears the burden of proving a tax deficiency. See, e.g., Tax Ct. R. 142(a)(1) (outlining circumstances that require burden shifting).

---

[4] At trial, the Cavallaros pointed out that the rule applying a presumption of correctness was substantially changed by the Internal Revenue Service Restructuring and Reform Act of 1998. See 26 U.S.C. § 7491. However, those changes are not applicable here because the examination at issue began before the effective date of the statute.

The Cavallaros argue that the Tax Court erred by refusing to shift the burden of proof to the Commissioner. We review their claim de novo. See Estate of Abraham v. Comm'r, 408 F.3d 26, 35 (1st Cir. 2005).

### 1. For An Excessive and Arbitrary Deficiency Notice

Burden-shifting for an excessive-and-arbitrary deficiency notice is a fairly narrow doctrine. See United States v. Janis, 428 U.S. 433, 441-42 (1976). It involves "a challenge to the deficiency assessment itself on the basis that it bears no factual relationship to the taxpayer's liability, not a challenge to any proof offered by the Commissioner at trial before the Tax Court." Zuhone v. Comm'r, 883 F.2d 1317, 1325 (7th Cir. 1989). Where an assessment is shown to be "naked" or utterly without foundation, we remand the case for further action to determine the amount that might lawfully be taxed. See Janis, 428 U.S. at 442 (citing Rexach, 482 F.2d at 16-17 & n.3). In this limited circumstance, the presumption of correctness is overcome, and the burden shifts to the Commissioner. See id.

The threshold question, then, is whether the Cavallaros have carried their burden of producing evidence from which it can be concluded that their deficiency assessments utterly lacked rational foundation. The Cavallaros' challenge falls short of the mark. Cf. Pittman v. Comm'r, 100 F.3d 1308, 1313 (7th Cir. 1996)

("[C]ourts commonly find this showing [that a deficiency assessment lacks a rational foundation] to be made when the Commissioner makes no evidentiary showing at all.").

The original deficiency notices assumed that, pre-merger, Camelot had no value. According to the Cavallaros, the Commissioner's later realignment with the Bello valuation conclusively established that the Commissioner "used no formula at all" and lacked "any support at all" for that initial $0 valuation. Thus, they allege, the Commissioner's assessment was "without rational foundation and excessive." Taylor, 293 U.S. at 514.

Without more, however, the fact that the Commissioner later conceded a portion of the original deficiency does not compel a conclusion that the initial assessments lacked a rational foundation.[5] Cf. McMurty v. Comm'r, 203 F.2d 659, 665–666 (1st Cir. 1953) (declining to shift burden where Commissioner reduced the amount of the claimed deficiency); Silverman v. Comm'r, 538 F.2d 927, 931 (2d Cir. 1976) ("The taxpayer does not carry his burden of showing the determination invalid simply by pointing to the fact that the Commissioner has reduced his original deficiency claim prior to trial.").

_____

[5] This is true even though the Commissioner's adoption of the Bello report reduced the Cavallaros' alleged deficiency by roughly one-third.

- 11 -

Here, the Commissioner had discovered -- prior to issuing the original notices of deficiency -- that the Cavallaros had followed the advice of an estate-planning lawyer, Hamel, who advocated "squeez[ing] a few embarrassing facts into the suitcase by force" in order to memorialize technology transfers financially advantageous to the Cavallaro family. See Cavallaro v. Comm'r (Cavallaro II), T.C. Memo 2014-189, at *18. This, together with associated documents, was a sufficient basis for concluding that Camelot's value was de minimis. Cf. Silverman, 538 F.2d at 933 ("Valuation is . . . necessarily an approximation." (alteration in original) (citation omitted)). For us to require more would violate the general rule that courts will not look behind a deficiency notice to question the Commissioner's motives and procedures. Clapp v. Comm'r, 875 F.2d 1396, 1401 (9th Cir. 1989). We need go no further.[6]

The original deficiency notices were not arbitrary and excessive, and thus, no burden shifting was warranted.

---

[6] The two circuit cases cited by the Cavallaros do not persuade us otherwise. In Caracci v. Commissioner, 456 F.3d 444, 447, 456 (5th Cir. 2006), the Commissioner expressly conceded that the excise tax deficiency, which was grounded on a "brief, intermediate internal [valuation] analysis," was "excessive and erroneous." No such concession exists here, nor are we convinced on this record that the Bello report, standing alone, compels one. In Estate of Mitchell v. Comm'r, 250 F.3d 696, 702 (9th Cir. 2001), the estate tax deficiency notice rested on a stock valuation that the appraiser had altered according to the Commissioner's instructions, and that the IRS expert disavowed. The circumstances in the instant case are not analogous.

- 12 -

## 2. For a "New Matter"

Rule 142(a)(1) of the Tax Court's Rules of Practice and Procedure states: "The burden of proof shall be upon the petitioner . . . except that, in respect of any new matter, . . . it shall be upon the respondent."  Under the "new matter" exception, if the Commissioner "seeks to establish the deficiency on a basis not described in the Notice, the burden shifts to the Commissioner on that new basis."  Estate of Abraham, 408 F.3d at 35 (citing Shea v. Comm'r, 112 T.C. 183, 197 (1999)).  A new theory presented to support a deficiency is "treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence."  Id. (quoting Wayne Bolt & Nut Co. v. Comm'r, 93 T.C. 500, 507 (1989)).  If, however, the theory "merely clarifies or develops the original determination," it is not a new matter.  Id.

The Cavallaros argue that the Commissioner relied on a new theory of liability at trial.  Their claim is that the Commissioner abandoned his initial theory that Camelot was a worthless sham and then adopted a wholly new theory -- based on Bello's valuation -- that Camelot was overvalued by the Cavallaros. Therefore, the Cavallaros argue, the burden of proof with respect to this "new matter" should have been placed on the Commissioner.

The original deficiency notices do not allege that Camelot was a sham company.[7]  Rather, they explain:

> [U]nder IRC Section 2511[,] donor's merger of Knight Tool Co. into Camelot Systems, Inc. in return for 19% of the stock of Camelot Systems, Inc. resulted in a gift of $23,085,000.00 to the other shareholders of Camelot Systems, Inc.  Accordingly, taxable gifts are increased $23,085,000.00.[8]

The clear implication was that, because Knight was undervalued, the Knight-Camelot merger allowed for a disguised gift transfer from the Cavallaros to their three sons.

The Commissioner's subsequent adoption of the Bello report was simply a refinement of that original theory (i.e., a clarification of the extent to which Knight was undervalued).  We have previously said that "if a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter, and the burden of proof remains with the taxpayer."  Estate of Abraham, 408 F.3d at 36 (citing Abatti v. Comm'r, 644 F.2d 1385, 1390 (9th

---

[7] Although the Commissioner's Answers -- filed in response to the Cavallaros' Petition for Re-determination -- do refer to Camelot as a "shell" or "virtual shell" in several instances, these references cannot bear the weight that the Cavallaros place on them.  The Answers' overriding message is that the Cavallaros' share of the merged company was not "an accurate reflection of the value of Knight before the merger."  This is not in tension with the Bello report.

[8] This language, quoted from the notice of deficiency issued to Patricia Cavallaro, does not appear in the notice of deficiency issued to William Cavallaro.  The Tax Court deemed this omission inadvertent and non-prejudicial, and the Cavallaros do not challenge this determination on appeal.

Cir. 1981)).  The original deficiency notices were more than adequate to put the Cavallaros on notice that the Commissioner was challenging the value of Knight as transferred within the merger. Cf. Kikalos v. Comm'r, 434 F.3d 977, 983 (7th Cir. 2006) (holding that the Commissioner's change in the method of calculation for the income shortage was not a "new matter" and that the deficiency notice clearly put the taxpayers on notice of the liability theory underlying the new calculation).  Indeed, the Cavallaros' Petition for Re-determination makes it clear that they were aware all along that the value of Knight, to the extent that it exceeded the value of the stock they received at the time of the merger, would be integral to determining their tax liability.[9]

As neither of the Cavallaros' two burden-shifting theories succeed, we affirm the Tax Court's determination that the Cavallaros had the burden of proof.

**B. CAM/ALOT Technology**

The Cavallaros also challenge the Tax Court's finding that Knight owned all of the CAM/ALOT technology.  Specifically, they complain that the Tax Court's treatment of the "different

---

[9] Further showing the importance of Knight's value, in Cavallaro I, we stated: "The IRS suspected that the parties might have undervalued the Cavallaros' Knight company and overvalued the sons' Camelot company to disguise a gift to the sons in the form of post-merger stock."  284 F.3d at 239.

- 15 -

types of technology . . . as a single, undivided whole" was overly simplistic.  The record, however, amply supports the Tax Court's determinations.  See McMurray v. Comm'r, 985 F.2d 36, 40 (1st Cir. 1993) ("The tax court's ruling . . . is a factual finding that we must affirm unless it is clearly erroneous.").

As detailed above, Knight created the first CAM/ALOT system, and, even after Camelot's incorporation, the companies' financial affairs overlapped significantly.  Further, "[t]he few public registrations of intellectual property were all owned by Knight."  Cavallaro II, T.C. Memo 2014-189, at *8.  The CAM/ALOT trademark was registered to Knight until December 31, 1995, and four patent applications, each filed by William Cavallaro, identified Knight -- not Camelot -- as his assignee.  Id.  In 1992, before the instant controversy arose, the Cavallaros' accountants "determined that a portion of the work . . . done in prior years by Knight's engineers could be characterized as [research and development ("R&D")] costs eligible for [a Section 41 R&D] tax credit."  Id. at *9.  In light of that study, the accountants prepared amended tax returns for Knight for 1990 to 1993.  Id. Only after the involvement of the Cavallaros' estate-planning attorneys did the accountants prepare another set of amended returns for both Knight and Camelot, this time disclaiming the R&D credits previously taken by Knight and claiming them for Camelot. Id.

The Cavallaros, the Tax Court concluded, "manifestly gave no thought in 1987 to the question of which entity would own what intangibles." Id. at *19. The Tax Court rejected attorney Hamel's position that a transfer of CAM/ALOT technology occurred in November 1987. That month, the Cavallaros attended a meeting at which Ken, Paul, and James signed Camelot's articles of incorporation. During the meeting, the lawyer started to hand Camelot's corporate minute book to William Cavallaro, but William deflected the suggestion that Camelot was his and immediately handed the minute book to Ken, saying, "[t]ake it; it's yours." Although Hamel testified at trial that he construed this as a symbolic handoff of the CAM/ALOT technology, the court found no documentation to support such a transfer. Id. at *9 n.13. The court reasonably interpreted the 1995 affidavits and confirmatory bill of sale as evidence of a view -- shared by the Cavallaro family and their various advisers -- that the contemporaneous document trail showed that Knight, not Camelot, owned the CAM/ALOT technology and, therefore, supplemental documents were necessary to counter that impression. Id. at *19.

Analyzing the ownership question through the lens of a hypothetical bona fide purchaser at the time of the merger, see 26 C.F.R. §§ 25.2511-1(g)(1), 25.2512-8, the Tax Court concluded:

> If Camelot had offered itself to the market for acquisition claiming ownership of the CAM/ALOT technology, it is inconceivable that a hypothetical acquirer would do anything

- 17 -

other than demand to see documentation of Camelot's ownership interest--documentation that we have found does not exist.

Id.  It further found:

> [I]f Knight were dealing with an unrelated party which sold machines that had been manufactured at Knight's risk by Knight employees on Knight premises using technology developed by Knight personnel, where Knight had owned the only public registrations of [IP] and had claimed ownership of the technology in prior tax filings, it defies belief to suggest that Knight would have simply disclaimed the technology and allowed the unrelated party to take it.

Id.

Against this backdrop, the Cavallaros complain that the Tax Court erroneously treated CAM/ALOT as a "monolithic property interest," rather than seeing it for its discrete proprietary components.  They contend that the Tax Court should have ruled that Camelot owned two crucial property rights at the time of the merger: the trade secrets embodied in Camelot's mechanical drawings and the copyrighted CAM/ALOT operating software.  We disagree.

At trial, the Tax Court suggested that assessing potentially discrete proprietary components of CAM/ALOT might be a better approach.  It invited the parties to consider such an approach only insofar as it was helpful to framing the case and clearly warned that such an approach might not "survive the expert

testimony."[10] The Cavallaros continued to press their views that (1) Knight fully abandoned the CAM/ALOT enterprise in 1987, (2) Camelot subsequently designed an entirely new machine through Ken's innovation, and (3) Camelot paid Knight in full for using its resources and original technology. In brief, their position was that no gift transfer occurred in 1995. Accordingly, their present appeal for a piecemeal approach to the ownership question, as a belated alternative to avoid gift tax liability, is waived. Cf. Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("An appellant cannot change horses in mid-stream, arguing one theory below and a quite different theory on appeal.").[11]

---

[10] The subsequent expert testimony -- by both Bello and Murphy -- showed that their valuations were premised on CAM/ALOT technology being a single asset.

[11] In any event, the Cavallaros' argument that the Tax Court missed or misevaluated the legal import of the software notices and the legends for the mechanical drawings lacks merit. The record shows that the Tax Court carefully considered the gravitas of the Camelot name stamp and other proprietary claims from the viewpoint of an unrelated purchaser. See Culbertson, 337 U.S. at 746. While these few pieces of evidence do not fit neatly with the rest of the evidence suggesting that Knight owned the CAM/ALOT technology and that Camelot merely sold it, they are not enough to leave us "with the definite and firm conviction that a mistake has been committed" by the Tax Court. Schussel v. Werfel, 758 F.3d 82, 87 (1st Cir. 2014) (quoting Interex, 321 F.3d at 58).

Attempting to secure a foothold in this uphill climb, the Cavallaros contend that the Tax Court's evaluation of the technology evidence rests on "an inaccurate appraisal of controlling legal principles." This argument does not convince us that the Tax Court committed a reversible error.

We find the Cavallaros' remaining claims similarly unavailing and dispense with them briefly.  First, the record shows that the Tax Court did not myopically focus on Knight's original ownership of the CAM/ALOT technology; instead, it focused on ownership at the time of the Knight-Camelot merger.  Second, the Tax Court viewed the lack of any document memorializing a technology transfer between Knight and Camelot as material to the overall inquiry, not as dispositive.  Third, the Tax Court did not improperly defer to the accountants' property rights determination; rather, it saw their determination as indicative of the family's contemporaneous belief that Knight owned the CAM/ALOT technology.

The Cavallaros have advanced no argument that would warrant overturning the Tax Court's finding that Knight owned all of the CAM/ALOT technology at the time of the merger.  Where, as here, "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985); see also Crowley v. Comm'r, 962 F.2d 1077, 1080 (1st Cir. 1992).

## C. The Bello Valuation

In challenging the valuation provided by Bello and relied upon by the Tax Court, the Cavallaros argue that the Tax Court again erred with respect to the burden of proof.  The Tax

Court stated that the Cavallaros had "the burden of proof to show the proper amount of their tax liability," but the Cavallaros argue that their burden was actually to establish "that the alleged deficiencies were erroneous." They contend that this "legal error" by the Tax Court led to another: the court refused to consider their evidence that the Bello valuation was "fatally flawed."

Accordingly, our inquiry proceeds in two steps: first, we determine whether the Tax Court misstated the burden of proof; second, we consider whether the court erred in adopting Bello's valuation without considering its alleged defects.

## 1. Burden of Proof

Although the Tax Court did not misallocate the burden of proof at trial, we agree with the Cavallaros that the Tax Court misstated the content of that burden. The Commissioner's deficiency notices enjoyed a presumption of correctness, and the Cavallaros had the burden of proving by a preponderance of the evidence that they were erroneous. See Rexach, 482 F.2d at 16 n.3; see also Delaney, 99 F.3d at 23 ("[A] tax deficiency assessment is subject to reversal if the taxpayer establishes by a preponderance of the evidence that it was erroneous.").

The Tax Court reasoned that "[i]t is the Cavallaros who have the burden of proof to show the proper amount of their tax liability," but that they could not meet that burden because

- 21 -

neither of their valuations (i.e., neither Maio's nor Murphy's) remained standing in light of the Tax Court's finding that Knight, rather than Camelot, owned all of the CAM/ALOT-related technology. Therefore, the Tax Court adopted the Commissioner's Bello valuation in full, even while remarking on its "arguably flawed analysis."

But this statement on the Cavallaros' burden of proof is mistaken as a matter of law. In Taylor, the Supreme Court made it clear that once the taxpayer shows the Commissioner's determination to be "arbitrary and excessive," the taxpayer cannot be made to pay the amount assessed against him -- even if he fails to prove the correct amount of liability he owes. 293 U.S. at 515; see also Rexach, 482 F.2d at 16 n.3 ("[O]nce a taxpayer . . . has borne his burden of proving the Commissioner's determination invalid, he has no further obligation to show . . . how much" money is owed.).

## 2. Criticisms of The Bello Valuation

The Cavallaros attempted to show that the Commissioner's valuation was "arbitrary and excessive" by challenging Bello's methodology, but the Tax Court refused to hear those challenges on the grounds that, even if the Cavallaros were right, they could not show the correct amount of their tax liability. This runs squarely against the Supreme Court's holding in Taylor.

The Cavallaros should have had the opportunity to rebut the Bello report and to show that the Commissioner's assessment was "arbitrary and excessive."[12] If they succeeded in doing so, the Tax Court should have then determined for itself the correct amount of tax liability rather than simply adopting the Commissioner's position. See Taylor, 293 U.S. at 515–16 (stating that upon determining the Commissioner's valuation to be arbitrary, the Board of Tax Appeals should have conducted a "further hearing" in which it "heard evidence to show whether a fair apportionment might be made and, if so, the correct amount of the tax"); see also Worcester Cty. Tr. Co. v. Comm'r, 134 F.2d 578, 580–81 (1st Cir. 1943) (upon finding the Board's determination of value of a stock to be "arbitrary and excessive," remanding for "further action" on the correct value); Taylor v. Comm'r, 445 F.2d 455, 460 (1st Cir. 1971) ("[Under Taylor,] if a taxpayer proves that a deficiency asserted by the Commissioner is wrong but fails to prove there was no deficiency or the correct figure, the Tax Court cannot accept the Commissioner's admittedly erroneous

---

[12] Although, for reasons discussed at length above, the Commissioner's present action is not a "naked" assessment of tax, we grant the possibility that his method of arriving at the $29,670,000 valuation for the gift may nonetheless have been incorrect. Cf. Estate of Todisco, 757 F.2d at 5 ("[G]ranting for the sake of argument that the Commissioner's method of arriving at a ten percent gross profit margin was arbitrary . . ., it is clear nonetheless that Todisco earned bookmaking income in 1972 and 1973. The Commissioner's present action is thus not a naked assessment of tax.").

figure. Instead it must hold a hearing to determine what the correct figure is.").

In accordance with those cases, we remand so that the Tax Court can evaluate the Cavallaros' arguments that the Bello valuation had methodological flaws that made it arbitrary and excessive.[13] If the Tax Court determines that the Commissioner's assessment was arbitrary, then it must determine the proper amount of tax liability for itself.[14] "The court need not, in making this determination, be able to precisely establish the correct figures; reasonable approximations may be employed, provided the findings disclose the method used in calculating the deficiency." Miller

---

[13] The Cavallaros' brief explains the bases on which they argue that the Bello valuation was without foundation and excessive. The Commissioner suggests that those arguments are meritless in light of the Tax Court's factual findings. But it seems unwise for us to attempt to determine ourselves whether the Cavallaros have valid criticisms that make the Bello valuation arbitrary. Instead, the Tax Court ought to make that determination in the first instance.

[14] Estate of Elkins v. Commissioner, 767 F.3d 443 (5th Cir. 2014), which the Commissioner cites in opposition, is not to the contrary. There, the Fifth Circuit held that the Tax Court had erred in rejecting the taxpayer's evidence of fractional-ownership discounts for the purpose of artwork valuation, where nothing in the Commissioner's expert testimony, briefing, or oral argument "detract[ed] from or call[ed] into question" the taxpayer's evidence. Id. at 452. This case is entirely different because the Commissioner's valuation, although the last one standing, is not "uncontradicted, unimpeached, and eminently credible." Id. at 451. Rather, the Cavallaros offered serious criticism of the Commissioner's evidence.

Even if Elkins were correct, the Commissioner seems to concede that Elkins spoke too broadly in prohibiting the Tax Court from conducting its own valuation once the party with the burden of proof is shown to be erroneous.

v. United States, 296 F.2d 457, 460 (7th Cir. 1961).  The court is free to accept in whole or in part, or reject entirely, the expert opinions presented by the parties on the subject.  See Silverman, 538 F.2d at 933; see also Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938).  Further, the court may take new evidence, including a new expert valuation.

## V. CONCLUSION

For the above-stated reasons, we affirm the Tax Court's determination that the burden of proof was on the taxpayers and its finding that Knight owned the CAM/ALOT-related technology at the time of the Knight-Camelot merger.  However, insofar as the court misstated the nature of the Cavallaros' burden of proof, we reverse and remand the case for further proceedings in keeping with this opinion.  The extent of any further briefing, hearings, or evidence is left to the Tax Court's sound discretion.

**Affirmed in part, reversed in part, and remanded.**